# United States Court of Appeals for the Federal Circuit

---

**CENTILLION DATA SYSTEMS, LLC,**
*Plaintiff-Appellant,*

v.

**QWEST COMMUNICATIONS INTERNATIONAL, INC., QWEST CORPORATION, AND QWEST COMMUNICATIONS CORPORATION,**
*Defendants-Cross Appellants.*

---

2010-1110, -1131

---

Appeals from the United States District Court for the Southern District of Indiana in consolidated case Nos. 04-CV-0073 and 04-CV-2076, Chief Judge Larry J. McKinney.

---

Decided: January 20, 2011

---

VICTOR M. WIGMAN, Blank Rome LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were PAUL M. HONIGBERG; and KENNETH L. BRESSLER, of New York, New York.

VINCENT J. BELUSKO, Morrison & Foerster LLP, of Los Angeles, California, argued for defendants-cross appellants. With him on the brief was HECTOR G. GALLEGOS.

Before LOURIE, LINN, and MOORE, *Circuit Judges.*

MOORE, *Circuit Judge.*

Appellant Centillion Data Systems, LLC (Centillion) appeals the district court's grant of summary judgment that Qwest Communications International, Inc., Qwest Corporation, and Qwest Communications Corporation (Qwest, collectively) do not infringe the claims of U.S. patent no. 5,287,270 ('270 patent). Qwest cross-appeals the district court's grant of summary judgment that the asserted claims are not anticipated. Because the district court erred in granting summary judgment of noninfringement, we *vacate and remand.* Because there are genuine issues of material fact regarding anticipation, we *reverse and remand.*

BACKGROUND

The '270 patent discloses a system for collecting, processing, and delivering information from a service provider, such as a telephone company, to a customer. '270 patent col.1 ll.15-20. Prior to the '270 patent, according to the inventors, telephone companies did not have a system to process and deliver billing data to clients in an electronic format other than tapes used on a mainframe. *Id.* col.2 ll.29-39. The inventors developed a system for processing call data and delivering it to customers in a format appropriate for a personal computer. *Id.* col.2 l.66–col.3 l.6. The personal computers are adapted to perform analysis on the data using a specialized software package. *Id.* col.3 ll.34-48.

Claims 1, 8, 10, and 46 are relevant to this appeal. Claim 1 is illustrative and, at a high level, requires "a system for presenting information . . . to a user . . . com-

prising:" 1) storage means for storing transaction records, 2) data processing means for generating summary reports as specified by a user from the transaction records, 3) transferring means for transferring the transaction records and summary reports to a user, and 4) personal computer data processing means adapted to perform additional processing on the transaction records. Centillion concedes that the claim includes both a "back-end" system maintained by the service provider (claim elements 1, 2, and 3) and a "front-end" system maintained by an end user (claim element 4).

Centillion accused a number of Qwest's billing systems including Logic, eBill Companion, and Insite (accused products) of infringing claims of the '270 patent. For the purposes of this appeal, we need not differentiate between these products. The accused products include two parts: Qwest's back office systems and front-end client applications that a user may install on a personal computer. Customers who sign up for the accused products "have made available to them electronic billing information on a monthly basis." Appellee's Br. 9. Qwest also provides, as part of the accused products, software applications that a user can choose to install on a personal computer. A customer may take advantage of the electronic billing information without installing the software, but the software allows for additional functionality. Customers access data by download.

In most uses, the processing of information on the back-end is passive. Once a user subscribes, the back-end will perform its monthly processing regardless of whether the user chooses to download the data. However, the system allows for "on-demand" reports when a user, at a personal computer, requests different date ranges. These "on-demand" requests cause the back-end system to process data and deliver it to the user via download.

The parties filed cross motions for summary judgment regarding infringement. Qwest also filed a motion for summary judgment of invalidity and Centillion filed a motion for summary judgment of no anticipation. The district court granted Qwest's motion for summary judgment of noninfringement. *Centillion Data Sys., L.L.C. v. Qwest Commc'ns Int'l, Inc.*, No. 1:04cv73 (S.D. Ind. Oct. 29, 2009) (Opinion). The district court did not perform an element by element comparison. Rather, it considered whether, under our case law, Qwest could be liable for infringement of a system claim that requires both a back office portion as well as a personal computer operated by a user. All claims on appeal are system claims. The district court only considered infringement by "use" under 35 U.S.C. § 271(a). The district court held that *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005) defined use as "put[ting] the system into service, i.e., . . . exercis[ing] control over, and benefit[ting] from, the system's application." It held that under *BMC Resources Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007) and *Cross Medical Products v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005), an accused infringer must either practice every element or control or direct the actions of another that practices the element in question.

Applying this law to the facts, the district court determined that no single party practices all of the limitations of the asserted claims. Regarding Qwest, the district court determined that Qwest does not "use" the system under § 271(a) by providing the back-end portions of the accused systems and the software for a user to load on its "personal computer processing means." Opinion at 32. It held that, under its definition of "use," Centillion could not show that Qwest "practiced each and every element of the system claim." *Id.* Specifically, it held

that Qwest does not control the "personal computer processing means" of the asserted claims. *Id.* It held that, although Qwest provides the software, it does not require customers to load the software or perform the additional processing required by the asserted claims. *Id.* at 32-33. It further held that Centillion could not establish any direction or control of the customers by Qwest such that Qwest should be vicariously liable for the actions of its customers as in *Cross Medical*.

The district court further held that Qwest's customers did not "use" the patented system under § 271(a). Opinion at 34. It held that "Centillion has not demonstrated . . . that Qwest's customers directed or controlled the '[data] processing means' of the accused systems' 'back-end.'" *Id.*

The district court also granted Centillion's motion for summary judgment of no anticipation holding that the prior art COBRA system did not generate "summary reports as specified by the user" as required by the claims. Both parties appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review a district court's grant of summary judgment *de novo*. *ICU Med., Inc. v. Alaris Med. Sys. Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009). Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### I. Infringement

To analyze infringement in this case, we must first address the district court's definition of "use" under

§ 271(a) and its application of the rules of vicarious liability. Then, we apply the rule for "use" to the potential direct infringers in this case.

A. "Use" of a System Claim Under Section 271(a)

This case turns on what constitutes "use" of a system or apparatus claim under § 271(a). Centillion argues that the district court adopted an overly narrow interpretation and that "use" simply means "the right to put into service any given invention." Appellant's Br. 22. It argues that use does not require that a party "practice" every element, only that it use the system as a collective. In other words, Centillion argues that operation of one component of an invention may "put into service" the invention even if the accused infringer does not directly interact with other components. It argues that we explicitly defined "use" under § 271(a) in *NTP*. It further argues that by introducing a requirement that an individual party practice every claim element, the district court introduced concepts of infringement that apply only to method claims. Finally, it argues that the district court did not need to apply the rules of vicarious liability when Centillion is arguing that there is a single "user" of the system.

Qwest responds that the district court was correct, that to "use" a system under § 271(a), an accused infringer must exert control over or "practice" each claimed element. It further argues that we should reject the application of vicarious liability to "use." It argues that, although we have endorsed the notion of vicarious liability in the context of method claims, we should not extend this analysis to system or apparatus claims. It argues that we should require "use" of the entire system, practicing each element, by a single entity and should never look to the conduct of more than one party to determine "use."

Qwest further argues that public policy disfavors Centillion's proposed definition of "use" under § 271(a). It argues that to allow direct infringement of a claim that includes both a front-end personal computer and a back-end controlled by a service provider would subvert the statutory scheme for indirect infringement. It argues that if an end user can "put a system into service" even though it does not control back-end components, then there would be no need for the indirect infringement analysis. It also argues that the claims in this case are poorly drafted to require action by two distinct parties. It argues that we should not "remedy Centillion's ill-conceived claims" by defining "use" to cover the accused products. Appellee's Br. 52.

We have never directly addressed the issue of infringement for "use" of a system claim that includes elements in the possession of more than one actor. However, we defined the term in a very similar scenario in *NTP*. In *NTP*, the issue was whether infringement occurred within the United States. *Id.* at 1313. The claims and the accused product involved a handheld device operated by a customer as well as a number of relays operated by a service provider. One of these relays was located outside the United States. We had to determine whether a "use" by a customer of the entire system amounted to a "use" within the United States. We stated that "courts have interpreted the term 'use' broadly." *Id.* at 1316. Citing *Bauer & Cie v. O'Donnell*, 229 U.S. 1 (1913), we stated that the term use means "the right to put into service any invention." *NTP*, 418 F.3d at 1316-17. We went further to distinguish use of a claimed method from that of a claimed system and to hold that "[t]he use of a claimed system under section 271(a) is the place at which the system as a whole is put into service, *i.e.*, the place where control of the system is exercised and

beneficial use of the system obtained." *Id.* at 1317. Applying this rule to the facts of the case in *NTP*, we held that customers located in the United States who sent messages via the accused product used the overall system and the location of the use was in the United States.

Turning to the instant action, although *NTP* dealt with the situs of infringement rather than the nature of the infringing act, it interpreted the definition of "use" under § 271(a). We hold that to "use" a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it. *NTP*, 418 F.3d at 1317. The district court correctly determined that this definition from *NTP* was the proper one to apply. Opinion at 22.

The district court erred, however by holding that in order to "use" a system under § 271(a), a party must exercise physical or direct control over each individual element of the system. The "control" contemplated in *NTP* is the ability to place the system as a whole into service. In other words, the customer in *NTP* remotely "controlled" the system by simply transmitting a message. 418 F.3d at 1317. That customer clearly did not have possession of each of the relays in the system, nor did it exert the level of direct, physical "control" that the district court requires. To accept the district court's interpretation of "use" would effectively overturn *NTP* because the predicate "use" in that case would no longer fall under the definition of "use."

We agree that direct infringement by "use" of a system claim "requires a party . . . to use each and every . . . element of a claimed [system]." In order to "put the system into service," the end user must be using all portions of the claimed invention. For example, in *NTP*, the end user was "using" every element of the system by

transmitting a message. It did not matter that the user did not have physical control over the relays, the user made them work for their patented purpose, and thus "used" every element of the system by putting every element collectively into service.

### 1. "Use" by Qwest's Customers

Centillion argues that, under the correct definition of "use" from *NTP*, Qwest's customers put the claimed system into service. It argues that a system is put into service "when it is engaged to accomplish the purposes for which it is intended." Appellant's Reply Br. 32. It argues that Qwest's customers use the system by subscribing, thus causing the back-end portions of the system to act and then downloading the reports. It argues that this is sufficient to put the entire system into service.

Qwest argues that its customers do not "use" the system because they do not control the back-end processing. It argues that Qwest performs the back-end processing and provides the result—not the processing itself—to the customer. It argues that the customer then chooses autonomously whether to download this information and whether to install and use the Qwest software. It argues that under *Cross Medical*, a customer could only be liable for use of the system if Qwest actually provided the back-end processing hardware and software to the customer so that the customer could control it.

There are two different manners of operation of the Qwest system relevant to this appeal. First, there is an on-demand function where a customer "seeks particular and specified information" by creating a query that the Qwest back-end system processes and provides a result for download (on-demand operation). Appellee's Br. 44. Second, during the normal functioning of the system after a user subscribes, Qwest's back-end systems create peri-

odic summary reports (standard operation) which are available for the user to download.

We hold that the on-demand operation is a "use" of the system as a matter of law.[1] The customer puts the system as a whole into service, *i.e.*, controls the system and obtains benefit from it. The customer controls the system by creating a query and transmitting it to Qwest's back-end. The customer controls the system on a one request/one response basis. This query causes the back-end processing to act for its intended purpose to run a query and return a result. The user may then download the result and perform additional processing as required by the claim. If the user did not make the request, then the back-end processing would not be put into service. By causing the system as a whole to perform this processing and obtaining the benefit of the result, the customer has "used" the system under § 271(a). It makes no difference that the back-end processing is physically possessed by Qwest. The customer is a single "user" of the system and because there is a single user, there is no need for the vicarious liability analysis from *BMC* or *Cross Medical*.

We also hold that the standard operation is a "use" as a matter of law. The standard operation allows users to subscribe to receive electronic billing information on a monthly basis. Once a user subscribes, Qwest's back-end system generates monthly reports and makes them available to the customer by download or other means. Qwest also makes available to customers software to load on their PCs to further exploit these monthly reports. Unlike the on-demand operation, this is not a one request/one response scenario. By subscribing a single

---

[1] As we discuss below, this does not dispose of the issue of infringement because the district court did not compare the accused system to the asserted claims.

time, the user causes the back-end processing to perform its function on a monthly basis. Like the on-demand operation, the back-end processing in normal operation is performed in response to a customer demand. The difference though is that a single customer demand (the act of subscribing to the service) causes the back-end processing monthly. But in both modes of operation, it is the customer initiated demand for the service which causes the back-end system to generate the requisite reports. This is "use" because, but for the customer's actions, the entire system would never have been put into service. This is sufficient control over the system under *NTP*, and the customer clearly benefits from this function.

Because the district court concluded as a matter of law that no single party could be liable for "use" of the patented invention, it did not compare the accused system to the claim limitations. We note that, although the customers "use" the system as a matter of law, this does not settle the issue of infringement. We will not decide, as Qwest requests, whether the accused products satisfy the "as specified by the user" limitations for the first time on appeal. Likewise, we decline to determine for the first time on appeal whether any individual customer has actually installed the Qwest software,[2] downloaded records, and analyzed them as required by the claims.[3] Because the issue has not been raised on appeal here, we

---

[2] Centillion concedes that in order to infringe, the customer must install Qwest's client software. Appellant's Br. 31.

[3] For purposes of its indirect infringement case, Qwest also asks us to determine that the accused products have substantial noninfringing uses. The district court did not address this issue in its opinion and we decline to perform this factual inquiry for the first time on appeal.

make no comment on whether Qwest may have induced infringement by a customer.

## 2. "Use" by Qwest

Centillion argues that there is a genuine issue of material fact regarding whether Qwest, by operating the back-end processing, "uses" the system under § 271(a). It argues that Qwest operates the back-end processing and provides the software to adapt the user's personal computer. It argues that this effectively puts the system into service and should qualify as use under § 271(a). It argues that under our precedent, actual performance of claim limitations is not required to establish infringement of a system or apparatus claims, citing *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002). Centillion also argues that, in some instances, Qwest customer service representatives can log into the system on behalf of an end user and operate all parts of the claimed system.

Qwest argues that, as a matter of law, it cannot "use" the system under § 271(a) because it does not control the claimed personal computer. Qwest argues that this case is analogous to *Cross Medical* where a third party assembled the complete system. Qwest asserts that, because it does not control the actions of its customers, it cannot meet the test of *Cross Medical* for vicarious liability. It further argues that the district court found that there was no evidence of Qwest customer service using the system as a whole on behalf of end users.

We agree with Qwest that, as a matter of law, it does not "use" the patented invention under the appropriate test from *NTP*. To "use" the system, Qwest must put the claimed invention into service, *i.e.*, control the system and obtain benefit from it. *NTP*, 418 F.3d at 1317. While Qwest may make the back-end processing elements, it

never "uses" the entire claimed system because it never puts into service the personal computer data processing means. Supplying the software for the customer to use is not the same as using the system.

The only way that Centillion can establish "use" by Qwest is if Qwest is vicariously liable for the actions of its customers such that "use" by the customers may be attributed to Qwest. Our precedents on vicarious liability, *BMC*, *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328-29 (Fed. Cir. 2008), *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 2009-1372, 2009-1380, 2009-1416, 2009-1417, 2010 WL 5151337 (Fed. Cir. Dec. 20, 2010), and *Cross Medical*, analyze the circumstances in which the actions of one party ought to be attributed to a second party for purposes of direct infringement – vicarious liability. In *BMC*, we noted that "[f]or process patent or method patent claims, infringement occurs when a party performs all of the steps of the process." 498 F.3d at 1378-79. However, we noted that in some instances, one party could be liable for infringement of a method claim even if it did not perform all of the steps. This vicarious liability arises when one party controls or directs the actions of another to perform one or more steps of the method. *Id.* at 1379. We confirmed this approach for method claims in *Muniauction*, 532 F.3d at 1328-29 and recently explained in *Akamai Technologies* that for infringement to be found when more than one party performs the steps of a method claim, an agency relationship or other contractual obligation to perform the steps must exist. *See Akamai Techs.*, 2010 WL 5151337, at *6. In *Cross Medical*, we considered the issue of vicarious liability for making a claimed apparatus or system under § 271(a). The claim related to a medical device and, as properly construed, required contact between the device and human bone. 424 F.3d at 1310-11. In the particular

facts of that case, the accused manufacturer created the accused product, but did not perform surgeries to bring the device into contact with bone. We held that the manufacturer did not "make" the claimed apparatus. We held that if anyone made the claimed apparatus, it was the surgeon who implanted the accused device, possibly bringing it into contact with bone. *Id.* at 1311. We noted that the manufacturer would not be liable for the surgeon's direct infringement unless the surgeon acted as an agent of the manufacturer. *Id.*

Following our vicarious liability precedents, we conclude, as a matter of law, that Qwest is not vicariously liable for the actions of its customers. Qwest in no way directs its customers to perform nor do its customers act as its agents. While Qwest provides software and technical assistance, it is entirely the decision of the customer whether to install and operate this software on its personal computer data processing means.

Centillion's reliance on *Fantasy Sports* is misplaced because the issue in that case was whether the district court erred by only considering indirect infringement. 287 F.3d at 1117-19. In *Fantasy Sports*, we held that the district court should have considered whether the defendant directly infringed the claims because it housed all of the necessary software on its servers. 287 F.3d at 1119. This does not equate to a holding that in order to prove "use" of a patented invention, a patent owner must only show that the accused infringer makes software available. As discussed above, the entire system is not used until a customer loads software on its personal computer and processes data. Qwest clearly does not fulfill this claim requirement.

## B.  Liability for "Making" under § 271(a)

Centillion argues that there is a genuine issue of material fact as to whether Qwest "makes" the claimed invention under § 271(a) and that it was therefore improper for the district court to grant summary judgment of noninfringement.  It argues that Qwest builds all of the parts of the system including the client-side software. Although Centillion concedes that the independent claim requires a "personal computer processing means," it argues that Qwest acts as the "mastermind" of the system by directing and controlling its customers' action to install the software.  Appellant's Br. 37 (citing *Muniauction*, 532 F.3d at 1329).

Qwest responds that Centillion waived this argument by not bringing it below.  If the argument is not waived, Qwest argues that it asserts virtually no control over its customers to complete the system.  It argues that its customers are free to choose whether to install the software.  With or without the software, they can still download and view their reports.

The district court did not address this issue in its opinion, likely because Qwest's motion for summary judgment of noninfringement and Centillion's response focused on "use."  Centillion argues that the issue is not waived because, in its response to Qwest's motion, it incorporated by reference its own motion for partial summary judgment of infringement that mentioned Qwest's liability for "manufacture" of the accused systems.  J.A. 6323.  We need not reach the issue of whether a single statement in an incorporated brief is sufficient to preserve an issue, because Qwest does not "make" the patented invention under § 271(a) as a matter of law. Qwest manufactures only part of the claimed system.  In order to "make" the system under § 271(a), Qwest would

need to combine all of the claim elements—this it does not do. The customer, not Qwest, completes the system by providing the "personal computer data processing means" and installing the client software.

Further, Qwest is not vicariously liable for the actions of its customers; as discussed above, Qwest's customers do not act as Qwest's agents as a matter of law nor are they contractually obligated by Qwest to act. *See Akamai Techs.*, 2010 WL 5151337, at *6; *Cross Medical*, 424 F.3d at 1311.[4]

## II.  Invalidity

In response to Qwest's motion for summary judgment of invalidity, Centillion filed a motion for summary judgment of no anticipation. These motions addressed anticipation for prior sale under § 102(b) based on a system called COBRA that had a similar function to the claimed invention. The district court denied Qwest's motion and granted Centillion's motion holding that the COBRA system did not anticipate the asserted claims as a matter of law.

In the 1980s, the phone company New York/New England Exchange (NYNEX) created the COBRA system to solve the same problem addressed by the '270 patent. It sought to replace paper statements and computer tapes with a more user-friendly format. COBRA created diskettes for customers with billing information for use on personal computers. There were four different types of records, TOLL and three other records that arguably did not directly involve the cost of toll phone calls. For exam-

---

[4]    Centillion also argues that Qwest employees can remotely log into customer computers to install the software. Centillion cites no evidence to support this statement and Qwest argues that its personnel have access to customer accounts, not computers.

ple, one of the other record types involved charges for rented equipment. A customer could choose to receive reports on one or more of these record types. Like the asserted claims of the '270 patent, COBRA comprised a back-end system as well as a software package for customers to install on their personal computers. The system became available for subscription in 1987 and was renamed TRACE.

The district court granted summary judgment of no anticipation holding that COBRA did not generate "summary reports as specified by the user" as required by the claims. The court's claim constructions are undisputed. It construed "summary reports" to mean "a collection of analyzed and/or reorganized data." It construed "as specified by the user" to mean "customer selects, or makes specific, the character of." This means that, to anticipate, the COBRA system must generate "a collection of analyzed and/or reorganized data that a customer selects, or makes specific, the character of."

The district court held that the COBRA system did not meet this limitation. It relied on the fact that COBRA was simply an extension of the prior art mainframe system that allowed users to select a record type (e.g., TOLL) and receive monthly reports on tape. It held that the '270 patent contemplated more than simply collecting the same call data previously provided on a paper bill or tape. It stated that the "summary reports" of the '270 patent involved more processing of the data and placing the data into a different format. It held that the '270 patent contemplated greater customer input than simply selecting a record type. Accordingly, the district court held that there was no genuine issue of material fact that COBRA did not meet the "as specified by user" limitation of the independent claims.

Qwest argues that there are genuine issues of material fact as to whether COBRA discloses "summary reports as specified by the user." It first argues that the district court was incorrect to find that COBRA was merely an extension of the prior art system that provided the same data on magnetic tape. It argues that COBRA had to reformat all files for use on a personal computer. Further, it argues that the district court improperly applied its own construction. It argues that COBRA users could select which type of report they wanted (e.g., TOLL) and the resulting reports meet the construction "a collection of analyzed and/or reorganized data that a customer selects, or makes specific, the character of." In other words, if a customer received only its TOLL records, this would be a collection of reorganized data that the customer selected.

Centillion argues that the COBRA system only allowed users to access one type of record that included "rated" calls, the TOLL file. It argues that the court should only consider rated calls, because they are the only types of calls relevant to billing. Further, it argues that Qwest cannot rely on the COBRA system because NYNEX concealed all of the back-end processing. It argues that NYNEX only provided the public with the software for personal computers and concealed all of the processing that is relevant to the claims. It asks us to consider this issue for the first time on appeal. Cross-Appellee's Resp. Br. 48, n.25. It argues that even commercial sale will not result in a § 102 bar if the seller does not fully disclose the claimed invention, citing *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370-71 (Fed. Cir. 1998).

The district court erred by holding there was no genuine issue of material fact that COBRA meets the "summary reports as specified by the user" limitation. There is a factual dispute as to whether the records that COBRA

provided are "summary reports" as construed by the district court. The different reports, such as the TOLL report, are arguably "a collection of analyzed and/or reorganized data" because they present records in a format that was previously unavailable. Further, there is a factual dispute as to whether these summary reports are created "as specified by the user." This claim term has a broad construction of "customer selects, or makes specific, the character of." The COBRA customer could define which record type it wanted in the reports provided by the system. This is arguably "select[ing] or mak[ing] specific, the character of" a report. Because there are genuine issues of material fact regarding whether COBRA satisfies the "summary reports as specified by the user" claim limitation, we hold that summary judgment was improper.

Regarding the failure to publicly disclose, we will not decide this for the first time on appeal. Qwest disputes almost every fact presented by Centillion. It does not appear that this issue is amenable to summary judgment, and if it is, the district court should consider it in the first instance.

Because genuine issues of material fact remain, we reverse the district court's grant of summary judgment of no anticipation. We remand the case for further proceedings.

## VACATED-IN-PART, REVERSED-IN-PART, and REMANDED